May it please the court, my name is Daniel Struck, I represent the appellant, Sheriff Joseph Arpaio of Maricopa County, Arizona. The issue presented today is whether or not the district court erred in granting an injunction which prohibited the sheriff from streaming live internet images of arrestees and pre-trial detainees at the Maricopa County Jail onto the internet. Sheriff Arpaio asserts that under the standard that was a... This isn't being done now, it hasn't been done for a couple of years, is that right? That is correct. The internet site first went up in June of 2000. Because of the number of hits, internet hits, internet users trying to get onto the website, the county's website could not handle it so they had an arrangement with an entity known as Crime.com. They used to do some of those reality TV shows to actually provide the appropriate size bandwidth to accommodate the website. Crime.com went out of business and the site was shut down on April 26, 2002. But in his declaration or in a representation to the district court, he indicated that he would do it again if he could find a domain. That is correct. We did represent to the district court that the sheriff was actively looking for somebody else to take Crime.com's place, therefore the judge ruled that the mootness doctrine did not apply because it was capable of repetition. That's not an issue you're arguing here. That is not an issue that we're arguing here today. Because apparently indeed the sheriff might want to do this again or would like to do this again. Correct. And in fact we're asking for the court to reverse the district court's decision to enjoin him from streaming the images onto the internet. Now the reason that the district court stated, the stated reason as to why the injunction was granted is that under Bell v. Wolfish, the streaming of the images of arrestees onto the internet constituted punishment. The court gave short shrift or completely ignored the reasons that were given via affidavit as to why the sheriff decided to set up the internet site in the first place. Those reasons were for deterrence of crime. And Bell v. Wolfish says several times that deterrence is a punishment, a judicial aim of punishment and not something that should be applied to pretrial detainees. Not a reason that supports punishment of pretrial detainees. Deterrence of crime in terms of, right, in terms of, Bell v. Wolfish does state that. But in this particular case, the deterrence of crime that the sheriff was trying to accomplish was to prevent individuals who had not yet committed crimes from not doing that. That's always true of deterrence. The other reasons. Is that what deterrence means? Yes, it is. So you will not commit a crime based on something that has happened. Must mean what Bell v. Wolfish meant. That is probably what Bell v. Wolfish meant when in that, I believe that was in the dicta in Bell v. Wolfish. Did Bell v. Wolfish involve the use of any of the things involved with the detainees to warn persons who were not yet in jail? No, it did not. So your point is that deterrence as used by judge, by Sheriff Arpaio has a different meaning than deterrence is used in Bell v. Wolfish? It was not used in the sheriff's case. He's trying to deter individuals from committing crimes as opposed to deterring misconduct from within the jail, which I believe, Your Honor, is correct, is what Bell v. Wolfish was identifying when discussing deterrence of crime. The other purpose that the sheriff had when. He wasn't trying to use it to deter prisoners, I mean, pretrial detainees from engaging in criminal conduct inside the jail? He was trying. One of the other reasons was to maintain discipline and order. Not necessarily deterrence of crime, but trying to improve the manner in which what he was trying to do was make sure that pretrial detainees or arrestees would not attack officers, or in turn, officers would not use excessive force against arrestees, knowing that in addition to the security cameras that were in place that were monitored by corrections, detention officers, that there were people on the Internet watching what was going on. And the sheriff believed that that would be an additional way in which to maintain discipline and order within the jail. The sheriff also wanted to expose the general public to the jail operations. The sheriff perceived that there were misconceptions as to how the jail was operated, that there were general press allegations relating to the conditions of the jail and how arrestees and detainees were. But that he really wasn't doing because he was simply looking at an area which was not the housing area or the day-to-day life of the jail detainees. The four cameras were set up in the intake area, which can hold one of the cameras is actually pointing into a holding, mail holding cell, a portion of it. And they can be in those cells for up to two to four days. Generally, they're not. Generally, they're processed quickly. But this was at least in the sheriff's eye gave the general public an idea of what goes on, particularly in the intake area or the horseshoe that they call it at the Maricopa County Jail. The cameras themselves, there were four. One was pointed into a holding cell. Another was in the area where fingerprinting and photographs, the mug shots were taken. Another was in an area where pat searches were conducted. And another was just in a hallway in an area where isolation cells were located. And the sheriff's idea was that, and this is actually where a lot of sometimes violent activity takes place because generally when, you know, people are arrested and they might be under the influence of drugs or alcohol, there might be more struggles that take place in that intake area, as opposed to if they're held over and have to remain in the jail. By that time, generally, they're not under the influence. If the real reason was to expose the general public to the jail operations, well, that's a strange way to do it because it's not a central part of the jail operation. Well, that's actually the intake areas where the vast majority of individuals who come into the jail system, I mean, everybody comes into that intake area. Not everybody goes into a more of a long-term type housing area. In fact, a small percentage of people do. But in terms of what the public's concern is about the jail operations, about the sorts of issues that have been raised with regard to Maricopa County Jail in general, my understanding is that they deal with things like food and housing and clothing and so on of people who are in the jail, not just at the entryway. That is correct. But there also was a lot of concern about how particular cases were handled in the intake area, which is where these cameras were located, which was one of the reasons why the sheriff put the cameras there. It is the sheriff's position that under Bell v. Wolfish, the reasons that were set forth to the district court as to why the injection was put in place were adequate. It is not. Are there any other reasons? These are the three principal reasons. Those are the three main reasons. That's correct. Are there any others? In terms of discipline and order, I think I mentioned that there was also a concern or the hope that an officer might not use excessive force if he knows that his image is being streamed onto the Internet. Discourage uses of excessive force. That's right. Now, originally you suggested that security was the reason, but you're not arguing that now. Well, essentially that is a security reason. Not so that the jail officials could see more about what's happening, because they already could see. They already had cameras. That's correct. But those were monitored by detention officers, and this is a much wider audience. Isn't that just a bit excessive? I.e., the whole world was watching? Well, to be honest with you, I don't know that the whole world was watching, because I still am. But the whole world could watch it. The whole world could watch it, but if they did, they would find it to be mostly very boring. I mean, I gather that one of the reasons this whole issue arose was because people around the world were watching and complaining of it. And actually that brings up a good point. These, I guess you'd call them, or at least the plaintiffs call them watchdog groups, were spending most of the time watching what was going on and would from time to time contact a sheriff's office and say, we believe that this particular officer is strip searching more African Americans than white officers or white people. We believe that this officer is being a little rough. So in that sense, I mean, it did give outsiders an opportunity to at least call in and state whether they believe that someone's rights were being violated. Well, not necessarily a citizen's review board, but certainly that was going on. How did they know whether there was strip searching going on? I wonder about that. Well, it's not, and let me explain. There's a camera that's pointed, I think, at the pat-down area I told you that I mentioned earlier. There's a screen. It's about a six-foot, six-foot-five screen. If the officer determines that he needs to strip search somebody, the person is taken behind the screen. You can't actually see the strip search, but you know that's why they're going back there. Okay. So that's how someone would know. As I was going to state, the standard of Bell v. Wolfish is not a high one. It's not a high hurdle for the sheriff to meet. All he has to show is that the reasons why he wanted to stream these images on the Internet was not arbitrary or purposeless. And the sheriff submits that all three of those reasons are not arbitrary, nor are they purposeless. They are all legitimate, non-punitive governmental interests, and therefore the court was incorrect in finding that, number one, that security was the only reason why the sheriff put them in and that it was redundant because there were already internal security cameras in place. Is it the sheriff's task under the state laws to deter crime other than in the area which is given to him in custody? I mean, isn't that what the police do? The sheriff is in charge of preventing crime and solving crime in Maricopa County. All of Maricopa County? All of Maricopa County. Not just the jail facilities? Exactly. Because here in San Francisco, our sheriff is mainly the custodian of the jails. Maricopa County is extremely large. Arizona has only 13 counties. Maricopa County is the size of some states. Outside of the city of Phoenix city limits and the city of Tempe city limits, the sheriff has jurisdiction over preventing crime. Law enforcement. Exactly. Has all law enforcement. So he has a very wide area that he has to control. The reasons under Bell v. Wolfish, they don't have to be the only alternative, and they don't have to be the best alternative. But they also don't have to be exaggerated. They cannot be exaggerated in their response to these considerations. Right? There's substantial evidence in the record to indicate that officials have exaggerated their response to these considerations. Okay. Well, the sheriff doesn't Whether this was an exaggerated response, given it's certainly unusual. I'm not aware that anybody else has ever done this. It is unusual, but you know It's reaching millions of people all over the world, not just in the United States, not just in Arizona, not the people who are concerned with the jails in Maricopa County, but everybody. It is. I agree with you that it is an unusual response. I disagree with you that it's exaggerated, particularly Well, with regard to the interest in jails and showing people what's going on in the jails in Maricopa County, the people in Maricopa County may care about that, and thousands of people in Sweden do. But they are looking at it because it's there. Right. Well, apparently, according to the plaintiffs, people in Ireland were interested in what was going on there and to ensure that or to make sure that the arrestees were being treated humanely. It also tells people in Ireland who plan to visit Phoenix what will happen to them if they have too many drinks and drive. That's correct. The only question really is whether the sheriff's decision to do this was rational, not whether the court agrees with him or whether it actually does advance governmental interests. And that's pursuant to Morrow v. Arpaio, the case that was decided by the Ninth Circuit en banc relating to the sheriff's policy of not allowing any depiction of frontal nudity, which was affirmed by the Ninth Circuit. We're reviewing the grant of a preliminary injunction. That's correct. And it's abuse of discretion. Isn't that correct? It's abuse of discretion or whether or not an erroneous legal standard. Did he apply it? Clearly erroneous findings of fact. Does the court judge identify Belva v. Wolfish and goes through the factors and reaches his conclusion? Yes, he does. How can we say that he used an erroneous legal standard? Well, one of the arguments. Like the fact that he said that it was an exaggerated response. Right. One of the arguments in our brief was that Belva v. Wolfish was probably not the correct standard for the court to use, that he should have used Fourth Amendment, which he looked at and decided that there was no Fourth Amendment violation. And also under the case law, the 14th Amendment, the informational privacy case is the Whelan v. Roe case. Which case? Whelan v. Roe is cited in our briefs, the WHA alien. Then there's also Paul v. Davis in which an arrestee sued for violation of his right to privacy because of a publication of the arrest record, the actual arrest record, which the Supreme Court said that there is no expectation of privacy for that publication, which is very similar to what's actually happening here. These individuals have no. It's a little different. Well, the fact, the information that is getting out, actually getting out on the Internet is the fact that this person has been arrested. That's not the only information. It's also information about how they behaved when they were arrested. It's information about how they behaved when they were in the holding cell. It's information. It's basically, it's information about their behavior in a place that is not, into which the public cannot usually walk. But it's not highly personal or intimate type of information that is normally protected under the 14th Amendment, such as medical records or tax records, that type of information. There's no cases. As I understand it, as you say, they can be there for two to four days. They are basically living their lives in jail for that time period on the Internet. Well, it goes back to the 1962 Lanza case where the court said that surveillance has always been the order of the day in jails and that none of the attributes of privacy within homes exist in the jail. And as to the people who are legitimately in the jail to take care of them, but these other people who are another who knows how many million people who are not their caretakers in the jail or their supervisors in the jail, what interest do they have in seeing their daily lives in the jail? Again, they have the sheriff's hope that they would watch these images and that they would be encouraged not to commit crimes in Maricopa County. But insofar as the nature of the invasion of privacy, or even if we don't call it an invasion of privacy, detrimental injury, things that people will not like. No more so than the fact that they wouldn't like that people know that they were arrested or that people see on the nightly news them walking in with handcuffs on into the jail. That they were arrested is a public record, which somebody who wants to get can get. There is something in the record, I recall, where some representative of the plaintiffs walked into the jail and said, I'd like to go see this area because you say it's public. And they said, no, no, you can't see it. Actually, people can see. They can get in. Non-disruptive people can make appointments to, for example, Boy Scout groups have toured, school groups have toured, high school groups. People can tour. The individual was a paralegal of Middle Ground, who the sheriff determined to be a potentially disruptive force if entering his jail, given the fact that their whole purpose is to file lawsuits on behalf of inmates. So that's why she was not let in. I would like to reserve the rest of my time. Thank you. May it please the Court, Scott Ambrose on behalf of the plaintiffs and the appellees. Your Honor, on behalf of my clients and literally the thousands of people who passed through the jail while the jail cams were on, I would like to first, before discussing the nuances of Bell v. Wolfish and perhaps Turner v. Safley, I would like to briefly discuss the repugnancies and the obnoxiousness that the sheriff created through his jail cam. He did so at the expense of innocent detainees who he lowered to the level of zoo animals. And in so doing this, he aligned his jail operations clearly with Internet pornographers, sadomasochistic voyeurs, skinheads, racists. Are you accusing the sheriff of soliciting the link that allowed somebody who has a pornographic link to put Crime.com on? Is that your position? I don't believe that he solicited them. Of course he didn't. Yes, but it was the result of that. He also has a panache for publicity stunts. And it is the effect, and I think this Court can- Would this Court prevent somebody who has a pornographic link linking into Crime.com? No, this Court cannot- That would be a First Amendment issue, wouldn't it? Why are you blaming the sheriff for this? Because people who like to watch pornography like to watch Arpaio's show, right? Yes. Are you concerned about that? I am gravely concerned about that. Why? Because the sheriff, Arpaio, has taken these personal matters, and he has put them on the Internet, and he's allowed this. And I think the Court needs to consider the effect of the violation that has occurred. This issue comes back to the status of the case, which is, yeah, that happened, but it's not happening now, and we have no idea the next time it goes on the Internet, if it ever does go on the Internet, in what circumstances it's going to go on. We don't know that this is going to be possible, not be possible, controlled, not controlled. So we really can't worry about this kind of detail at this point, can we? I believe that in the case of the plaintiff's claim for damages, and I believe that the irreparable harm upon which the plaintiffs are suing for damages. We only have a preliminary injunction that we're dealing with. I know, but again, the irreparable harm that occurs to a person, and I believe that this is something the Court should consider. The fact that a sadomasochistic site showing a woman bound and tied also has a link to the jail site. It had a link, but doesn't now. Yes, but again, Your Honor, the sheriff's stated intention. My point is this. He has a stated intention of putting it back on the Internet. Does he have a stated intention of putting it back on the Internet in such a way that it can be linked to a sadomasochistic site again? Well, clearly that's going to happen because, again, the nature of the hits and the people who are viewing this, these voyeurs and these racist sites, linking these sites to the jail cam, clearly shows an element of the irreparable harm. Your time is beginning to run, and counsel for the county, for the sheriff, did raise the argument that the district court did not apply the correct legal standard. This is an appeal from the grant of a preliminary injunction, and we review for abuse of discretion. If the district court applied the wrong legal standard, then the district court abused its discretion. Your Honor. How about that? Very good. The only correct legal standard or the beginning of the correct legal standard in a case with pretrial detainees is Bell v. Wolfish. The first analysis that needs to be done, not with prisoners who have already been convicted, but with pretrial detainees is Bell v. Wolfish, the issue being whether or not pretrial detainees are being subject to punishment. It matters not whether or not the punishment, if they were convicted prisoners, is a reasonable punishment. That's what Bell v. Wolfish says. It's your contention, I take it, that the exhibition of these detainees on the Web site constitutes punishment to them. Is that right? Yes. How do you arrive at that conclusion? And in Bell v. Wolfish, the Court set out, citing the older Mendoza standard, of what is punishment. And Your Honors have already discussed this with my opponent, that being a major issue of deterrence, humiliation, deterrence, retribution, which is these were either the express or the inferred intent of Sheriff Arpaio. Now, I assume he would say it wasn't retribution and it wasn't, but it was deterrence. And it is a little, Bell v. Wolfish definitely says that deterrence is an attribute of punishment and not appropriate for pretrial detainees, but that's a little odd because deterrence can be accomplished in many ways. Punishment is one of them, but there are others. Right? I mean, if somebody was trying to deter crime, would look at how they punish people as an example to others, but would do other things, too. Right? I agree wholeheartedly. The, again, Unlike retribution, for example, which is punishment. Well, on the retribution, why else are we, retribution is why else would we be humiliating these people? Why would we be subjecting them to this? That is part of the retribution which can be inferred. Isn't every I mean, we turn on the television. We see Martha Stewart. We see all these executives doing what they call a perp walk. That doesn't occur by accident. I mean, the obviously the channels are tipped off by law enforcement people that they're going to do at this time, because the law enforcement people like to show everybody that they're doing their job. Is that punishment to Martha Stewart and the rest of them? Because if it is, it sounds pretty unconstitutional to me. We ought to go after CBS and ABC. And sometimes and there are cases and we've cited them that often that type of behavior is actionable. And the publicity of a perp walk is actionable. Yeah. Yes. We've cited several cases that that type of behavior can be actionable. Occasional of those. The Demarest case cited in our brief, Your Honor. Also, that is the those that would be dealing with the issue and the rights of the media. This is not a media case. No, you're dealing with the rights of the government. Right. Also, under Paul v. Davis, the official act of an arrest is can be published. This is much more. This is people sleeping. This is people eating. This is people taken to the level of being a zoo animal. And, again, the clearly and under Bell v. Wolfish were asked to either find the expressed intent or the inferred intent of the sheriff. The express intent is clearly deterrence, which is a form of punishment under Bell v. Wolfish. Quote, the purpose behind the installation of the Internet cameras were deterrence of crime. Sheriff Arpaio also believed that the images of inmates depicted in the early hours of custody might cause those inmates from acting up. So it was either deterrence from the general population and deterrence from those particular inmates. In Bell v. Wolfish, the deterrence was of the detainees not to commit other crimes in the future by treating them harshly. Isn't that what they were talking about? Right. And that can be inferred. When Sheriff Joe Arpaio says my stated intent is deterrence and he lists all these other avenues of deterrence, I think the court can reasonably infer, and clearly Judge Carroll did, that what was happening here by Sheriff Arpaio was a form of punishment. Humiliation, being humiliated, that is not a purpose of being arrested because that person who's arrested may be innocent. But having the stigma of a felony conviction is punishment. Being in prison and saying I was in prison for 30 years or whatever is punishment. Being humiliated before the world is punishment, and it's clearly an exaggerated response to any legitimate needs of the sheriff. I'm sorry, Your Honor. In Paul v. Davis, presumably a good number of the people whose arrest records were being exposed were not convicted of anything. It's an official act, Your Honor. That's what Paul v. Davis said is that an arrest is an official act of the state. And that can be published. But if you judged it under Bell v. Wolfish, I don't remember whether Paul was before or after Bell v. Wolfish, but if you judged it under a Bell v. Wolfish standard, where would you come out? If you judged the Paul v. Davis policy under Bell v. Wolfish, it's a little off because it wasn't in prison, but still, what was the purpose of it that wasn't punishment? The logic behind Bell v. Wolfish is they were not addressing whether or not it was punishment. I don't believe that they assessed one way or the other whether or not the publication of an official act. It didn't involve incarceration? The people were not incarcerated at the time? My understanding of Paul v. Davis is that the publication of an official act by the state is something, a public record, which can be published. Isn't that humiliating to the people as to who was published? Well, it certainly is the least restrictive means, and it's not an exaggerated response. So to say that jail cams and allowing people to be seen in areas of undress, various states of dress and undress, watching them sleep, seeing them exposed in this way, watching them scratch and eat for 24 hours a day, is clearly not an official act. The official act is over once you say this person was arrested. As we stand, every person who is arrested is on their website. That issue is not here. Sheriff Joe Arpaio has got a picture of everybody that's arrested, and he publishes it for about two or three weeks, and what they were arrested for. That's not what we're here about. We're here about the exaggerated response to a humiliation. Now, you said you started your analysis with Bell v. Wolfish, and you said that's just the first step. Very good, Your Honor. Thank you. Where do we go from there? Yes. Bell v. Wolfish is the shortest distance between two points, because we don't look at whether or not it's a constitutional violation. It could be legitimate punishment. It still violates the due process of a pretrial detainee. The next issue, which was not addressed in oral argument by my opponent, is whether or not this violates a constitutional right, even if it was a prisoner, and that would be the Turner v. Safley analysis. And, again, that was not what Judge Carroll decided. But as was pointed out by my opponent, this court can uphold an injunction for any reason, not just the reason that was cited by Judge Carroll. So I think it's important that perhaps we take a look at, is this cruel and unusual punishment? Is there a violation of a constitutional right? And that would be under a Turner v. Safley analysis, and that analysis is when a prison regulation impinges upon an inmate's constitutional rights, the regulation is only valid if it's reasonably related to a legitimate penological interest. And there's four factors which I can discuss. What's the constitutional right? And that was exactly what I was about to say. Let me take cruel and unusual punishment. Is it harassing? Is it cruel and unusual to humiliate somebody in this way, not just saying that Joe Smith is a convicted murderer of a violent crime and that he's going to be incarcerated for 30 years, but to show a prisoner in their daily activities, eating, sleeping, doing whatever, being subjected to all the humiliations and the indignities that we've alleged in our complaint? It seems to me this is a much harder argument than your first one. Why do you want to get into it? It's the shortest distance between two points. I can talk more about Bell v. Wolfish. How would you say that? I mean, you said that Bell was just a first step. I have six minutes. I have six minutes left, so I'd like to take at least a couple, and then if I have time I'll go back to Bell v. Wolfish, which is clearly the easier point. But under the factors, is it a legitimate penological interest? Factor number one, it has to be a valid rational connection must exist between the prison regulation and a legitimate government interest put forward to justify it. What we're saying here is, is there a valid connection between deterrence and doing this? Well, Your Honors, the people who are seeing this and the thousands of hits, they wanted to see abuse. Again, the people who wanted to see this stuff were the people at whitesonly.com and the voyeur sites. And so there is no valid connection between the legitimate, there's no legitimate state interest. Was there an alternative means of exercising the right? The private court didn't make any findings on any of that, what you just said. No. Again, this was not a finding. This was not the rationale of Judge Carroll in the district court. But, again, as I've indicated, you can uphold this injunction on any means. You can say it's a constitutional right. Not if we have to make findings, though. Pardon me? Not if we have to make findings. I believe that you can review the record, which is and. . . This is a summary judgment. Okay. But I believe a preliminary injunction can be upheld on other grounds than just stated by the trial court. Based on the fact findings, but I don't think we can go make new fact findings that weren't made. And, okay, if the court doesn't want to entertain that, but I believe that that was argued in the briefs at length by both parties as to what was the justification for Judge Carroll. And I believe it can be read. So, for example, Judge Carroll used the language in exaggerated response to a prison concern, which is the fourth factor of a constitutional violation under Turner v. Safley. That exaggerated response. . . You're arguing what's your constitutional violation here, cruel and unusual punishment? Well, there would be numerous, Your Honor. I believe that it would be a cruel and unusual punishment. I believe that it's a 14th Amendment privacy right. . . A cruel and unusual punishment. You don't. . . I don't think you get into Turner. I mean, it's cruel and unusual, period, at the end. That would be under the Eighth Amendment. It would also be a 14th Amendment privacy violation under Whalen v. Roe, which was discussed already. A Fourth Amendment privacy distinguishing Hudson v. Palmer. A Fourth Amendment seizure of a person's image and identity. They cannot take a person's image and identity and seize it at this length. That belongs to that person. And that is a seizure of their image and their identity way beyond what would be permissible under the Constitution in showing a mug shot, for example. All of these could be constitutional violations. And, again, all of the four factors. There is no legitimate penological interest, and this is clearly an exaggerated response to any perceived reason that the sheriff has for doing this. The sheriff's real reason is shown right next to the website or on the banner on the top of the website when you saw these streaming images. Let's look and infer the fact that Sheriff Joe Arpaio was selling his video for $15 as the intent. What is the real intent? Is he saying that I want to improve my jails, or does he want to sell his video for $15, which would be the true intent of that? Isn't really your best argument that this is covered by the district court correctly to stand for articulating Bell versus Woolfish? There's no question, Your Honor. That this gave his reasons. He inferred punishment from everything in the district court. It's clearly the shortest distance. And we're reviewing for abuse of discretion. That's exactly right, Your Honor. It's abuse. You do have to find the abuse of discretion. And Bell versus Woolfish analysis, which is the shortest distance in eliminating this, because the court doesn't have to determine whether or not there's a constitutional violation to inmates and prisoners. The court just determines that it is a violation of the 14th Amendment due process when you punish a pretrial detainee. It was all right for the trial judge to totally disregard any other reasons but security, which he found didn't exist as a good reason. The idea of deterring people out on the street, the other ideas Mr. Strzok gave, it was all right for him to completely eschew any findings on those grounds in eschewing a preliminary injunction because that was within his discretion. I think Judge Carroll didn't do that. I think he was quite prudent. As the record will reflect, Judge Carroll went to the jails and he found – Take a look at his findings and his order. Is there a word in there about deterrence of people other than in the jail? Is there a word about transparency of jail operations? Not a word. All he's concerned there is this is not security and this is punishment. That's what he says. I think when Judge Carroll says, I viewed it and right next to these Internet cameras were the closed circuit cameras, he's saying that the security needs are met. But did he fail to take into consideration the other claimed legitimate governmental reasons for the Internet web? Your Honor, that's exactly our point. Sheriff Joe Arpaio is not allowed to deter crime. That's punishment. He is only housing pretrial detainees. It is not. That is what my point is. It is a violation of the 14th Amendment due process. But any deterrence is punishment. That's how you read Bell v. Wolfish. Well, again, whether the – at page 537 of Bell v. Wolfish, it tells you that it discusses what the difference is between punishment and that which would not be punishment or that which would be permissible in detaining these pretrial detainees. And there's other factors. Look at whether or not historically the sanction is regarded as punishment, whether or not the operation will promote the traditional aims of punishment, retribution and deterrence, whether the behavior which applies to it is already a crime, whether an alternative purpose to which it may be rationally connected is assignable. That one clearly applies. An alternative purpose being the closed circuit and also the fact that people can – that the act of their arrest can also be punishment. But the main one is whether or not – and this is a factor of what is punishment – whether or not it appears excessive in relation to the alternative purpose assigned. And clearly that that's what he said. It's just excessive. This was excessive punishment. Thank you, counsel. The matter will stand submitted. And we are in recess, I guess, until Friday. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Hi, Judge Beyer. You're missing. No, I just have a couple of things here. Tomorrow is one of the dates for the day. I'm sorry? This is for tomorrow. Do you need another one? No, what I need is one for today. Do you have one? Thanks. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Paez, Berzon, Bea